RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

No. 09-3751

CAROL METZ, on behalf of herself and all
others similarly situated, et al.,

Plaintiffs-Appellants,

v.

UNIZAN BANK, et al.,

Defendants-Appellees.

Nos. 09-3751/3879/4363

No. 09-3879

JAMES LOYD, et al.,

Plaintiffs-Appellants,

v.

HUNTINGTON NATIONAL BANK, et al.,

Defendants-Appellees.

No. 09-4363

BILLY BLAIR, et al.,

Plaintiffs-Appellants,

v.

BANK ONE,

Defendant,

CHARTER ONE BANK, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Ohio at Akron and Cleveland.
Nos. 05-01510; 08-02301; 08-00971—Donald C. Nugent, District Judge;
Solomon Oliver, Jr., Chief District Judge.

Argued: May 31, 2011

Decided and Filed: August 19, 2011

Before: MARTIN, NORRIS, and SILER, Circuit Judges.

1

---

**COUNSEL**

**ARGUED:** J. Brian Kenney, KEHOE & ASSOCIATES, LLC, Cleveland, Ohio, Daniel G. Morris, LAW OFFICES OF DANIEL G. MORRIS, Cleveland, Ohio, for Appellants. Frances Floriano Goins, ULMER & BERNE LLP, Cleveland, Ohio, Elizabeth Petrela Papez, WINSTON & STRAWN, Washington, D.C., Michael E. Mumford, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellees. **ON BRIEF:** J. Brian Kenney, Robert D. Kehoe, KEHOE & ASSOCIATES, LLC, Cleveland, Ohio, Daniel G. Morris, LAW OFFICES OF DANIEL G. MORRIS, Cleveland, Ohio, for Appellants. Frances Floriano Goins, Thomas L. Anastos, Reem Shalodi, ULMER & BERNE LLP, Cleveland, Ohio, Michael E. Mumford, Katie M. McVoy, BAKER & HOSTETLER LLP, Cleveland, Ohio, T. Thomas Cottingham III, Jack M. Knight, Jr., Valerie B. Mullican, WINSTON & STRAWN LLP, Charlotte, North Carolina, Patrick M. McLaughlin, McLAUGHLIN & McCAFFREY, LLP, Cleveland, Ohio, Marcel C. Duhamel, Elizabeth A. Ratliff, Jocelyn N. Prewitt-Stanley, VORYS, SATER, SEYMOUR AND PEASE, LLP, Cleveland, Ohio, Karen L. Giffen, Melissa A. Laubenthal, Kathleen A. Nitschke, GIFFEN & KAMINSKI, LLC, Cleveland, Ohio, Martha S. Sullivan, Joseph P. Rodgers, Stephen P. Anway, SQUIRE, SANDERS & DEMPSEY L.L.P., Cleveland, Ohio, David M. Dvorin, CHERNETT WASSERMAN YARGER, LLC, Cleveland, Ohio, Jay Clinton Rice, GALLAGHER SHARP, Cleveland, Ohio, Steven A. Anderson, FITZPATRICK, ZIMMERMAN & ROSE CO., L.P.A., New Philadelphia, Ohio, Bart Greenwald, FROST BROWN TODD LLC, Louisville, Kentucky, Bonnie L. Wolf, FROST BROWN TODD LLC, Columbus, Ohio, Mitchell G. Blair, Fritz E. Berckmueller, Kevin R. Carter, CALFEE, HALTER & GRISWOLD LLP, Cleveland, Ohio, Rosemary Taft Milby, WELTMAN, WEINBERG & REIS CO., L.P.A., Cleveland, Ohio, Orla E. Collier, Mark D. Tucker, BENESCH FRIEDLANDER COPLAN & ARONOFF LLP, Columbus, Ohio, Matthew T. Fitzsimmons, R. Christopher Yingling, NICOLA, GUDBRANSON & COOPER, LLC, Cleveland, Ohio, David A. Wallace, Joel E. Sechler, CARPENTER LIPPS & LELAND LLP, Columbus, Ohio, Richard J. Thomas, Amanda J. Banner, HENDERSON, COVINGTON, MESSENGER, NEWMAN & THOMAS CO., L.P.A., Youngstown, Ohio, Aaron H. Bulloff, KADISH, HINKEL & WEIBEL, Cleveland, Ohio, Karen Soehnlen McQueen, KRUGLIAK, WILKINS, GRIFFITHS & DOUGHERTY CO., L.P.A., Canton, Ohio, for Appellees.

---

**OPINION**

---

SILER, Circuit Judge. After falling victim to a Ponzi scheme, the Metz, Loyd, and Blair plaintiffs (collectively "Plaintiffs") sued a number of banks to recover their

lost investments. The district court dismissed all claims filed by the Loyd and Blair plaintiffs as time-barred. It dismissed most claims filed by the Metz plaintiffs as time-barred or for their failure to state a claim but allowed two fraud claims to proceed, both of which were ultimately unsuccessful. The Plaintiffs now appeal. For the reasons below, we **AFFIRM**.

## I.

The Plaintiffs' suits arise out of a Ponzi scheme orchestrated by James P. Carpenter III ("Carpenter"). In 1991, Carpenter pleaded guilty to aggravated theft and bank fraud, served jail time, and was eventually disbarred as an attorney. Later, between 1998 and 2000, he masterminded a Ponzi scheme in which he sold investments in three sham companies. The Blair plaintiffs were sold fraudulent debentures in Rawhide Select, Inc. ("Rawhide"), and the Metz and Loyd plaintiffs were sold fraudulent debentures in Serengeti Diamonds, U.S.A., Inc. ("Serengeti"), and Lomas De La Barra ("Lomas"). Carpenter sold these debentures through salespeople, who told the Plaintiffs they would receive a guaranteed return of over 10 % annual interest. Although Carpenter made interest payments and partial redemptions to investors during the course of the scheme, Rawhide, Serengeti, and Lomas were mere instruments of fraud, and Carpenter stole nearly all of the Plaintiffs' investments.

In 2000, several victims filed a class action against Carpenter in state court. *See Posen v. New England Int'l Surety*, No. 2000-06-2623 (Summit County Court of Common Pleas) (the "*Posen* case"). A class action settlement was eventually reached in which Carpenter consented to a $15,644,384 judgment. A settlement was also reached with his daughter, Ashley Carpenter, who was a teller at Unizan Bank, N.A. ("Unizan"), where Carpenter opened accounts in the names of Lomas and Serengeti. In the settlement, the *Posen* plaintiffs agreed to release the Carpenters from any further liability arising from the Ponzi scheme.

The Plaintiffs in this case sued two classes of banks Carpenter used to carry out his scheme: drawee banks and depositary banks. The Plaintiffs alleged the drawee banks

violated the Uniform Commercial Code's ("UCC") "properly payable rule" by issuing payment from their checking accounts for checks they wrote to Carpenter's sham corporations.  The Plaintiffs alleged the depositary banks violated the UCC and committed fraud by depositing their checks into accounts maintained for Rawhide, Serengeti, and Lomas.  The drawee and depositary banks moved to dismiss the Plaintiffs' actions under Federal Rule of Civil Procedure 12(b)(6), alleging that Plaintiffs' UCC and fraud actions were both barred by the applicable statutes of limitations and failed to state a claim.

The district court in *Blair* and *Loyd* subsequently dismissed all claims as time-barred.  In *Metz*, the district court dismissed the claims against the drawee banks as time-barred and dismissed most of the claims against the depositary banks for failure to state a claim.  However, it allowed the claims of conspiracy to commit fraud and aiding and abetting fraud against Unizan to proceed.  Jonas Yoder was then substituted for Carol Metz as the named plaintiff and proposed class representative.  After denying class certification, the district court granted Unizan's motion for summary judgment on Yoder's conspiracy claim based on his release of Ashley Carpenter in the earlier *Posen* litigation.  A jury trial was held on Yoder's aiding and abetting fraud claim that resulted in a verdict in favor of Unizan.

## II.

The Plaintiffs contend the district courts erred in not applying a discovery rule to their UCC claims and dismissing them as time-barred.  Both sides agree the statute of limitations embodied in O.R.C. § 1304.09 applies to the Plaintiffs' "properly payable" claims.  Both sides also agree the statute of limitations embodied in O.R.C. § 1303.16(G) applies to the Plaintiffs' other UCC claims.  Both statutes of limitations provide that an action "shall be brought *within three years after the cause of action accrues*."  O.R.C. §§ 1304.09, 1303.16(G) (emphasis added).  The only dispute is whether these limitations periods should have started running only when the Plaintiffs discovered the Ponzi scheme.

We review a district court's grant of a Rule 12(b)(6) motion to dismiss de novo. *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009). In reviewing the exercise of diversity jurisdiction, we are bound to apply Ohio law in accordance with the currently controlling decisions of its highest court. *See Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2001). In the absence of such decisions, we may also look to Ohio's lower courts. *See Ventura v. The Cincinnati Enquirer*, 396 F.3d 784, 792 (6th Cir. 2005).

**A.  The Plaintiffs Cannot Cast Their UCC Claims as Conversion Claims**

In seeking to supplement these statutes of limitations with a discovery rule, the Blair and Loyd plaintiffs argue their various UCC claims are actually claims for conversion and are therefore subject to the discovery rule in O.R.C. § 2305.09. Section 2305.09 states, "If the action is . . . for the wrongful taking of personal property, the cause[] thereof shall not accrue until the wrongdoer is discovered." The Plaintiffs, however, pleaded none of their UCC claims as conversion claims or as claims for the wrongful taking of personal property[1]; rather, the Plaintiffs raised claims of violation of the properly payable rule, failure to act with ordinary care, breach of the duty of good faith, and money had and received.

Further, even if we interpreted the Plaintiffs' allegations as claims of conversion, the Plaintiffs would be statutorily barred from raising such claims. The Ohio UCC establishes a cause of action for conversion of an instrument, stating, "The law applicable to conversion of personal property applies to instruments." O.R.C. § 1303.60. However, the same statute bars such claims by issuers of checks. It states, "An action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument . . . ." *Id.* An issuer is a "maker or drawer of an issued or unissued statement," O.R.C. § 1303.01(A)(6), and there is no dispute the Plaintiffs are the makers of the arguably converted checks here. Therefore, this provision definitively bars them

---

[1]Conversion and the wrongful taking of personal property are interchangeable terms. *See, e.g.*, *Irvin v. Pysel*, No. 47461, 1984 WL 5529, at *2 (Ohio Ct. App. May 10, 1984) (internal quotation marks omitted) ("Conversion is generally defined as the wrongful assuming of unauthorized control over the personal property of another, whether it is done purposefully or not.").

from bringing a claim for the wrongful taking of personal property, and as a result, the Plaintiffs cannot possibly re-characterize their claims to make use of the discovery rule in § 2305.09.

**B.     Ohio Law Precludes Application of a Discovery Rule to the Plaintiffs' UCC Claims**

The Plaintiffs contend that, even if their UCC claims cannot properly be characterized as claims for conversion, Ohio law nevertheless supports the application of a discovery rule to claims brought under §§ 1304.09 or 1303.16(G). Ordinarily, under Ohio law, "a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed." *Collins v. Sotka*, 692 N.E.2d 581, 582 (Ohio 1998). The discovery rule is an exception, *see Norgard v. Brush Wellman, Inc.*, 766 N.E.2d 977, 979 (Ohio 2002), and only applies in situations "where the wrongful act does not immediately result in injury or damage," *Harris v. Liston*, 714 N.E.2d 377, 379 (Ohio 1999).

Although the Ohio Supreme Court has not addressed whether a discovery rule applies to §§ 1304.09 and 1303.16(G), three Ohio appellate courts have, and none has applied it. *See Mattlin Holdings, L.L.C. v. First City Bank*, 937 N.E.2d 1087, 1091 (Ohio Ct. App. 2010) (for a UCC conversion claim, § 1303.16(G) "is not tolled by a discovery rule"); *W. Ohio Colt Racing Ass'n v. Fast*, No. 10-08-15, 2009 WL 737776, at *5 (Ohio Ct. App. Mar. 23, 2009) (§ 1303.16(G) begins running at the time of the wrongful conduct); *Connors v. U.S. Bank*, No. 07AP-649, 2008 WL 1759071, at *6 (Ohio Ct. App. Apr. 17, 2008) (for failure to exercise ordinary care under the UCC, both §§ 1304.09 and 1303.16 begin running at the time of wrongful conduct).

This approach is consistent with the treatment of statutes of limitations for UCC claims in the majority of other jurisdictions. *See John Hancock Fin. Servs., Inc. v. Old Kent Bank*, 346 F.3d 727, 734 (6th Cir. 2003) (rejecting application of discovery rule to Michigan UCC claim); *Rodrigue v. Olin Emps. Credit Union*, 406 F.3d 434, 445–47 (7th Cir. 2005) (collecting cases holding discovery rule inapplicable to UCC claims); *Menichini v. Grant*, 995 F.2d 1224, 1230 (3d Cir. 1993) ("[M]ost courts have refused to

apply the discovery rule to negotiable instruments."). This is especially relevant given that Ohio's Supreme Court has found it "desirable to conform [its] interpretations of the Uniform Commercial Code to those of [its] sister states." *Edward A. Kemmler Mem'l Found. v. 691/733 E. Dublin-Granville Rd. Co.,* 584 N.E.2d 695, 698 (Ohio 1992). We decline to apply a discovery rule to the statute of limitations in either §§ 1304.09 or 1303.16(G) when considering the timeliness of the Plaintiffs' UCC claims.[2]

## C.  The Plaintiffs' UCC Claims Are Time-Barred

Since no discovery rule applies, the Plaintiffs waited too long to file their UCC claims. The Plaintiffs allege that Carpenter's Ponzi scheme, including his opening bank accounts and depositing checks, took place between 1998 and 2000. Under the three-year statutes of limitations in §§ 1304.09 and 1303.16(G), the Plaintiffs had until 2003 at the latest to file their UCC claims. Because the Plaintiffs waited until 2005 and 2008, their UCC claims are accordingly time-barred.

Even if we were to apply a discovery rule to §§ 1304.09 and 1303.16(G), the Plaintiffs' UCC claims are still time-barred because they knew of the possibility of wrongdoing more than three years before bringing their claims. Under the discovery rule, an action accrues "at the time when the plaintiff discovers or, in the exercise of reasonable care, should have discovered the complained of injury." *Investors REIT One v. Jacobs*, 546 N.E.2d 206, 209 (Ohio 1989). A plaintiff, however, "need not have discovered all the relevant facts necessary to file a claim." *Flowers v. Walker*, 589 N.E.2d 1284, 1287 (Ohio 1992). Rather, under the discovery rule, a statute of limitations begins running once plaintiffs are deemed to be on "notice to investigate the facts and circumstances relevant to [their] claim in order to pursue [their] remedies." *Id.* at 1288. Information "sufficient to alert a reasonable person to the possibility of

---

[2]The Metz plaintiffs argue that the district court should have certified this issue to the Ohio Supreme Court. But as explained above, Ohio law provided a clear and principled course for the district court to determine that a discovery rule did not apply to § 1304.09. *See Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). Thus, the district court did not abuse its discretion in making this determination without first certifying the issue to the Ohio Supreme Court.

wrongdoing" gives rise to this duty to investigate. *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985).

Here, the Plaintiffs were on notice of the defendant banks' possible wrongdoing by 2001. Between 1999 and 2001, Carpenter stopped making interest payments to the Plaintiffs from their investments in his sham companies. A reasonable person would have been alerted to the possibility that the drawee banks had debited the Plaintiffs' accounts with checks that were not properly payable because they were made to fraudulent companies. A reasonable person would also have been alerted to the possibility that the depositary banks violated their duty to act with ordinary care and in good faith by maintaining accounts for fraudulent companies. Thus, under a discovery rule, the Plaintiffs would have had until 2004 to bring their UCC claims. Because they waited until 2005 and 2008, §§ 1304.09 and 1303.16(G) would *still* bar the Plaintiffs' UCC claims, even under a discovery rule.

## III.

The Blair and Loyd plaintiffs contend the district court also erred in dismissing their fraud claims as time-barred. The district court applied the Ohio blue sky law statute of limitations when dismissing their fraud claims, but the Plaintiffs assert the common law fraud limitations period properly applies. The Ohio blue sky law provides a two-part statute of limitations for securities fraud claims: an action must be brought within two years after the plaintiff knew, or should have known, of the fraud or five years after the security sale, whichever is shorter. O.R.C. § 1707.43(B). In contrast, the Ohio common law fraud statute of limitations provides four years from the time the fraud is discovered, without limit, to file a claim. O.R.C. § 2305.09(C).

**A.  Ohio's Blue Sky Law Provides the Correct Statute of Limitations**

We have previously held, "Ohio law is clear that [where] fraud claims arise out of or are predicated on the sale of securities, they are governed by the specific statute of limitations set forth in Ohio Rev. Code § 1707.43(B); not the four-year general statute

of limitations for fraud claims found in Ohio Rev. Code § 2305.09." *Wyser-Pratte Mgmt. Co v. Telxon Corp.,* 413 F.3d 553, 561 (6th Cir. 2005).

While the Plaintiffs do not caption any claim as securities fraud, in determining the applicable statute of limitations, we should "look to the actual nature or subject matter of the case, rather than the form in which the action is pleaded." *Lawyer's Coop. Pub. Co. v. Muething*, 603 N.E.2d 969, 973 (Ohio 1992) (internal quotation marks omitted). In their actual nature, the Plaintiffs' fraud claims arise out of the sale of securities. The Plaintiffs believed that, in return for their money, they were receiving valid investments representing their interest in Rawhide, Serengeti, or Lomas. That these securities turned out to be fake, or were worthless, is the source of the fraud they allege the defendant banks to have facilitated. *See Ryan v. Ambrosio*, No. 91036, 2008 WL 5258308, at *1–3 (Ohio Ct. App. Dec. 18, 2008) (applying § 1707.43 to plaintiffs' common law fraud claims where defendants sold plaintiffs securities in a company defendants falsely represented was "an ongoing business, taking in revenue, with huge financial profit").

The Plaintiffs contend that even if the fraud involved the purported sale of securities the district court should not have applied the blue sky statute of limitations because Carpenter did not sell any actual securities. In support, the Plaintiffs cite *Ferritto v. Alejandro*, 743 N.E.2d 978, 979–83 (Ohio Ct. App. 2000), where an investment advisor misappropriated money entrusted to him for investments, the common law fraud statute of limitations applied. This precedent, however, does not influence our determination. The *Ferritto* court reached its decision because it concluded "the [blue sky] statute of limitations . . . applies only if a violation of [Ohio's blue sky law] has occurred," *id.* at 982, relying on our decision in *Nickels v. Koehler Mgmt. Corp,* 541 F.2d 611, 616 (6th Cir. 1976), holding the same. However, we overruled *Nickels* in *Wyser-Pratte Mgmt. Co.,* 413 F.3d at 561, determining that Ohio law applies the blue sky limitations period to all claims of fraud arising out of the sale of a security, not just those alleging violation of Ohio's blue sky law. *Wyser-Pratte*

*Management Co.*, then, undermines the precedential value of *Ferritto* and supplies the rule of decision as the current law of the Sixth Circuit.

## B.  Plaintiffs' Fraud Claims Are Time-Barred

Under the Ohio blue sky law statute of limitations, Plaintiffs' claims are time-barred.  As discussed in II.C, the Plaintiffs should have discovered any alleged misconduct by the defendant banks by 2001.  This means that, under the statute of limitations in § 1707.43(B), the Plaintiffs had until 2003 to file their fraud claims.  Because they waited until 2008, their claims are untimely.  Even if we were to apply the common law fraud statute of limitations in § 2305.09(C), the Plaintiffs' claims would still be time-barred.  Under this four-year statute of limitations, the Plaintiffs had until 2005 to file their fraud claims.  Again, because they waited until 2008, their claims would still be untimely.

## IV.

Yoder, the only remaining plaintiff from the *Metz* case, argues that once the district court declined to grant him class certification it no longer had subject matter jurisdiction to pass on his claims.

The sole basis for federal jurisdiction in *Metz* comes from the Class Action Fairness Act of 2005 ("CAFA").  28 U.S.C. § 1332(d).  CAFA does not specifically address whether a district court may retain jurisdiction following the denial of class certification.  We agree with the other circuits that have addressed this issue and hold that "denial of class certification does not divest federal courts of jurisdiction." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Shell Oil Co.*, 602 F.3d 1087, 1091 (9th Cir. 2010); *accord Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 n.12 (11th Cir. 2009).

CAFA grants jurisdiction over class actions in which the parties are minimally diverse and the amount in controversy exceeds $5 million.  28 U.S.C. § 1332(d)(2).  A "class action" is defined as "any civil action *filed under* rule 23 of the Federal Rules of

Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." *Id.* § 1332(d)(1)(B) (emphasis added).  The "filed under" language shows that it is the time of filing that matters for determining jurisdiction under CAFA.  Congress did not base CAFA jurisdiction on a civil action being "certified" as a class action, but instead on an action being "filed under" the rule governing class actions.

Although district courts have relied upon other language in CAFA to determine that they do not retain jurisdiction following denial of class certification, we agree with the *Cunningham* court's contrary interpretation of these sections.  For example, CAFA states, "This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action." *Id.* § 1332(d)(8).  As explained in *Cunningham*, the likely explanation for this section is that "the defendant can wait until a class is certified before deciding whether to remove the case to federal court," not that certification is a requirement for continued jurisdiction.  592 F.3d at 806. Also, CAFA defines a "class certification order" as "an order issued by a court approving the treatment of some or all aspects of a civil action as a class action."  28 U.S.C. § 1332(d)(1)(C).  *Cunningham* explained that this section merely means "a suit filed as a class action cannot be *maintained* as one without an order certifying the class. That needn't imply that unless the class is certified the court loses jurisdiction of the case."  592 F.3d at 806.  If Congress meant to divest the district courts of jurisdiction following denial of class certification, it could have said so explicitly.[3] *See United Steel*, 602 F.3d at 1091.

In addition to the statutory text, general jurisdictional principles support the conclusion that federal jurisdiction continues following denial of class certification.  The general rule is that "if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." *Freeport-McMoRan, Inc. v. KN*

---

[3]Indeed, an earlier version of the bill did say so. *See* Class Action Fairness Act of 2003, S. 274, 108th Cong. § 4(a)(2) (2003) (requiring the district court to "dismiss any civil action that is subject to the jurisdiction of the court solely under this subsection if the court determines the action may not proceed as a class action based on a failure to satisfy the prerequisites of rule 23 of the Federal Rules of Civil Procedure").

*Energy, Inc.*, 498 U.S. 426, 428 (1991); *accord St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289–90 (1938).[4] Also, a contrary reading of CAFA would mean that a district court would be unable to revisit an order denying class certification because it would no longer have subject matter jurisdiction. Such an interpretation would nullify Federal Rule of Civil Procedure 23(c)(1)(C), which provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment."

For these reasons, we conclude the district court retained subject matter jurisdiction following its denial of Yoder's motion for class certification.

## V.

Yoder also argues that the district court erred by granting Unizan's motion for summary judgment on his "conspiracy to commit fraud" claim. This claim sought to hold Unizan liable under the doctrine of respondeat superior, based only on an alleged conspiracy between its employee, Ashley Carpenter, and her father, James Carpenter. The district court granted Unizan summary judgment on this claim because of Yoder's release of Ashley Carpenter from future liability in the *Posen* case.

Under Ohio law, a plaintiff's "settlement with and release of the servant will exonerate the master." *Losito v. Kruse*, 24 N.E.2d 705, 707 (Ohio 1940); *accord Niemann v. Post Indus., Inc.*, 588 N.E.2d 301, 303 (Ohio Ct. App. 1991) ("[T]he release of a party who is primarily liable operates also as a release of any party who was only secondarily liable."). The reason for this rule is that typically when a plaintiff recovers from the master, the master is subrogated to the plaintiff's rights against the servant. *Munson v. United States*, 380 F.2d 976, 979 (6th Cir. 1967) (applying Ohio law). "However, where [the] plaintiff has first released the servant, the master would be unable to pursue his indemnity from the servant since his claim is based upon that of the

---

[4]Of course, if the jurisdictional allegations are frivolous or defective from the outset, then jurisdiction never existed in the first place, regardless of the plaintiff's invocation of a class action under CAFA. *See Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997); *see also Cunningham*, 592 F.3d at 806–07.

plaintiff and would be blocked by the agreement concluded between plaintiff and the servant." *Id.*

In the *Posen* case, Yoder agreed to "forever release, acquit and discharge [Ashley Carpenter] from any and all claims, liens, demands, obligations, judgments, actions, causes of action and liabilities whatsoever (except as specified herein), whether personal, property or economic, arising from the Investments or Dispute." If Unizan were held liable under respondeat superior for Ashley Carpenter's alleged conspiracy, this release would prevent Unizan from recovering from Ashley Carpenter in subrogation of Yoder's rights. *See id.* Accordingly, Yoder's settlement and release of Ashley Carpenter in the *Posen* case extinguished his cause of action in this case seeking to hold Unizan vicariously liable for Ashley Carpenter's alleged conspiracy to commit fraud.

**AFFIRMED**.